# NEW YORK SUPERIOR COURT.

THE CHATHAM BANK agt. FREDERICK B. BETTS and others.

Where the *indorsee* of a promissory note, made for the *accommodation* of the maker, procures it to be discounted by a bank in which he keeps his account, for and at the urgent solicitation of the *indorser*, after stating to the indorser that he has no money of his own with which he can discount the note, and after paying over to the indorser $2,200 of the proceeds of the $2,350 three months' note, retaining the sum of $150 for his commissions and trouble in procuring the discount and for indorsing the note, there is *no usury* affecting the note in the hands of the plaintiff—the bank, who discounted it at a legal rate of interest. And as respects the transaction between the *indorsee, indorser and maker*, the former acted as the *agent* of the latter.

*Special Term, May,* 1862.

THIS is a motion for a new trial upon a case made upon the ground that the verdict was against evidence. The action is on a promissory note drawn by the defendant Betts in favor of the defendant Thomas, indorsed by him and the defendant Potter. It was for $2,350, payable three months after date at the Mechanics' Bank, and dated on the 18th of September last. Two defences are set up in the answer; one that the suit is prosecuted for the benefit of the defendant Potter, who is the real party in interest, and the other is that the note in suit was given solely for the benefit of Thomas, without any consideration, and that it was discounted by Potter upon an usurious agreement with the defendant Thomas, by which the former reserved the sum of one hundred and fifty dollars as extra interest.

D. M. PORTER, *for plaintiff*.
IRA D. WARREN, *for defendants*.

ROBERTSON, Justice. On the trial, the defendant Thomas testified that the note in suit was given to realize the amount for Betts' benefit. The defendant Potter testified that Thomas

called upon him repeatedly with the note, asking him to discount it, to which the witness replied he had no money, when the former said, " you can get it discounted," and repeatedly stated he must have the money. He did not state for whose accommodation it was ; the witness refused to do it. Thomas said, " you can get it done at the bank." The former finally promised to see if he could get it done at the Chatham Bank. He did call at the bank, whose president said they were short. Thomas again called, and the witness again told him he did not think he could get it discounted, but was finally prevailed on to take the paper, and he offered it for discount. He asked the cashier of the plaintiffs if he *would discount a piece of paper for him,* who referred him to the president, who showed some disinclination to take it. Potter again told Thomas he did not think he could get the paper discounted. Prior to Potter going to the plaintiff's on the fifth of October, he said to Thomas, " if I can get this discounted, how much do you want to draw ? my account is about drawn out in the bank ;" and the latter said, " I must have $2,000." On the 4th of October, the president said it would be passed to Potter's credit on the morning of the 5th. It was discounted, and Potter gave Thomas a check for $2,000, and on the 21st a check for $208. The eight dollars had nothing to do with this transaction. In regard to the commission Potter was to charge, there was, as he testifies, " not the first syllable said about two and a half or three per cent., or any discount named." When the second check was given, Potter testifies not a word was said about the the balance. Thomas asked for a check for the balance, and the witness gave him one for $208, and no words passed. On cross-examination, this witness testified that he had had previous notes of Betts, indorsed by Thomas, which he had discounted at the rate of two and a half per cent. per month, and gave Thomas the money.

Upon this testimony it is perfectly clear that Potter

acted as the agent of Thomas and Betts in getting the note discounted, and that if he failed in delivering the whole proceeds received by him, whether the amount retained by him was understood to be a commission or not, for his trouble and responsibility in indorsing the note, it did not make the note usurious in the hands of the plaintiffs, who discounted it for Potter at the legal rate, as appears by the testimony of their president (Hayden.) He testified that the bank discounted this note for Potter, and on his credit, placing on the 4th of October, the sum of $2,315.50 to his credit. Potter borrowed the money of the bank. Prior to that time he had only a small balance of two or three hundred dollars to his credit. When the note was discounted and the money placed to Potter's credit, it was his money. After the note was protested, money of Potter's was left in the bank undrawn for. It was the plaintiffs' custom in such case not to allow it to be drawn for. The note was not charged back to him, or check presented for it. There was an implied understanding, although no positive arrangement, that the money should remain until the note was paid. The note was discounted at seven per cent.

To this is opposed the testimony of Thomas, who states that he got the note in suit, without paying anything for it, from the defendant Betts, to realize the amount for the benefit of the latter, and a day or two after took it to Potter, and asked him to discount it for him; to take it, and see what he could do for him. Nothing was then said about the rate. He said he could not do it at less than two and a half per cent. a month, and the witness left the note. This witness states he did not say anything; he left the note with Potter to get the money. He got $2,000 on the 5th of October, and the balance of $200 on the 20th, and $8, for another transaction, included in the check. Potter deducted $150 for the three months, and took the note for $2,200. Thomas deposited the money

he got from Potter in the bank where he kept an account, and passed it to Mr. Betts within a day or two; the transaction was on Betts' account. On being cross-examined, he stated that he asked Potter to take the note, *and try what he could do with it;* after receiving the $2,000 he asked for the balance of that note, and received the check for $208. "Potter said he would not do it less than the rate of about two and a half per cent. per month; *that it would not pay him to go to the bank to get the money, and get it discounted.*" He admitted that Potter gave as a reason for not discounting the note, he had no money and could not do it, and that he told him he got the money he gave him out of the Chatham or Grocers' Bank. The witness used the money he got for a little while, and paid it, in different amounts, to Betts; he admitted that Potter told him the bank was not ready to discount it.

This testimony does not vary the transaction. Thomas knew Potter did not have money to buy the note; that he went to get it discounted: nay, he asked him to take it and see what he could do with it. He waited after he was informed the bank had been applied to, and delayed discounting it until it would agree to do so; did not object when Potter told him that less than two and a half per cent. would not pay him to go to the bank and procure the discount; received the check of Potter, drawn on the bank by whom it was discounted, and obtained thereby the proceeds of such discount. Potter did not pay any money except the proceeds of the discount, which was made by crediting him with the amount, for which he drew the check in favor of Thomas. There is no room for the pretence that Potter first discounted the note at a usurious rate, and then procured it to be discounted by the bank; nor that the $150 was withheld, except to compensate him for the trouble of going there and getting it discounted, which involved the necessity of his indorsing the note.

There is not even a conflict of testimony in this case,

except as to the mention of the rate of commission, which is denied by Potter, although mentioned by Thomas, and that does not affect the transaction. Even the worst possible inferences from Thomas' testimony would hardly show an intent to make the transaction usurious. The testimony of the other witnesses shows it could not have been.

I do not find any error in the charge, or the verdict of the jury.

The motion for a new trial must therefore be denied, with costs.

———— ◆ ◆ ————

Note.—Duty to ourself and justice to the court require that a proper explanation should be given of the publication of the case of *Adams* agt. *Bush, ante page* 262. That case was entirely prepared, (except the head note,) as it is published and was sent to us for publication by H. C. Adams, Esq., the plaintiff, and an attorney and counsellor at law, a son of an old, respectable and able lawyer of Montgomery county, Henry Adams, whom we have personally known for a number of years. The case was published without that careful scrutiny which should have been given to it. Although the question involved was one of costs and fees for professional services, about which lawyers are apt to feel sensitive and nervous, especially when the decision is against them, and although allowance was made for a bitterness of feeling on the part of counsel in consequence of defeat, yet we are now satisfied, on a more careful study of the whole case, that in its preparation, which in style is objectionable, and especially in that of the briefs, there was an under-current of personal feeling which occasionally dictated language that was improper and offensive, considered as applicable to the court, the publication of which we deeply regret. It is always our desire to accommodate counsel, when we can, in publishing their briefs, as they are of benefit to the profession, and especially to the judges; and we will frankly say, that the plaintiff's brief in this case exhibits talent, labor and ability, and no doubt will be found very useful on the question of cumulative evidence in applications for new trials for newly discovered evidence.

It is hardly necessary for us to say, what all the profession know, that the court in the fourth judicial district have no superiors in their strict adherence to law in making their decisions, and certainly the judges of that district are not exceeded in their impartial liberality and urbanity towards the profession.    Reporter.